UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| LUVERNE FIRE APPARATUS, a | ) | CIV. 02-4036 |
| South Dakota Corporation, and | ) | |
| THE HARTFORD CASUALTY | ) | |
| INSURANCE CO., a Connecticut | ) | |
| Corporation, | ) | ORDER DENYING |
| | ) | DEFENDANT'S MOTION FOR |
| Plaintiffs, | ) | JUDGMENT AS A MATTER OF |
| | ) | LAW OR A NEW TRIAL |
| vs. | ) | |
| | ) | |
| CITY OF CINCINNATI, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Luverne Fire Apparatus sued the City of Cincinnati for breach of contract, alleging that it failed to accept delivery of four custom-built pumper trucks that City agreed to purchase from Luverne. City counterclaimed, alleging that Luverne breached the contract by failing to deliver trucks that met the agreed-upon specifications. The jury awarded Luverne a judgment in the amount of $89,201.84.

City now renews its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). In the alternative, City moves for a new trial pursuant to Fed. R. Civ. P. 59.

**FACTS**

Viewing the evidence in the light most favorable to Luverne, the non-moving party:  City has a fleet of 26 front-line fire pumpers[1] assigned to its 26 fire houses.  A pumper is  assigned to several different firehouses over the course of its lifetime, depending on its age and how many fire calls are assigned to the fire house.  Fire trucks are also temporarily assigned to a different fire house if all of the permanent trucks are dispatched to a large fire in the area, or when another truck is being used for training.  Thus, City uses only pumpers that can fit into all 26 fire houses.

In September 2000, City solicited bids for four custom-built fire pumpers.  A section entitled "Detailed Specifications" in the bid document listed hundreds of specifications.  Prospective vendors were instructed to indicate whether the equipment they offered complied with each specification.

Luverne manufactures fire trucks in Brandon, South Dakota.  Luverne's dealer in the Cincinnati area was ARMS, which was operated by Mark Vonderhuevel.  Dave Fornell, a salesman for ARMS, learned that City was soliciting bids for fire vehicles and obtained a copy of the bid document.  After consulting with Vonderhuevel and Luverne's president, Jeff Lautt, Luverne decided to submit a bid.  Prior to submitting the bid, Fornell talked with Tom

---

[1]A fire pumper carries water to the fire scene and pumps water at the scene.

2

Gamel, City's procurement manager.  Fornell checked whether Luverne's vehicles complied with the specifications listed.

Luverne submitted the lowest bid.  Luverne initially proposed trucks with a flat roof, but offered trucks with a ten-inch raised roof for no extra charge. The raised roof trucks provide additional head room for fire fighters.  City was interested in the raised-roof cab; however, City was concerned that the trucks would not fit into all of its fire houses.  Fornell brought a demonstrator truck to Cincinnati to test whether it would fit through the low doorways in City's old, historic fire houses.  The demonstrator truck narrowly fit.

City entered into a contract on December 27, 2000, for the purchase of four pumpers from Luverne for a total price of $1,134,772.  The bid document reflected that the overall height of the trucks would be 116 1/4 inches.  The contract required Luverne to deliver the trucks within 300 days of December 27, 2000, which was October 27, 2001.  Fornell also prepared a contract data sheet that contained specific information of concern to City.  For example, the data sheet stated that "Due to severely low clearances in older fire stations, the overall height shall not exceed 112"."

On March 5, 2001, City hosted a preconstruction conference.  Although various representatives from City, Luverne, and Luverne's parent company attended, Fornell and Gamel largely conducted the meeting.  They looked

3

through each page of the contract, and Fornell made handwritten notes on his copy of the bid document. He noted that the trucks "must clear 112" height." Gamel crossed out the 116 1/4 inches on the contract, and Fornell inserted the 112 inches specification onto the questionnaire. Joe Wolf, the captain responsible for special events and the Fire Prevention Bureau, noted on his copy of the contract that the truck height would not exceed 112" and dated the notation March 5, 2001. Both Fornell and Gamel indicated the overall length of the trucks would not exceed 372 inches. Fornell replaced 372 inches for overall length on his copy of the contract specifications with 370.5 inches; Gamel also made this change.

In September 2001, City sent an inspection team to Luverne's factory in Brandon, South Dakota. For several days, the team looked through each specification contained in the contract, including the clarifications and notes taken during the preconstruction meeting. Numerous problems were discovered, including screws that fell out and fluid leaks.

Luverne continued working on the trucks and drove them to ARMS's facility in Anna, Ohio. ARMS continued to work on the trucks to fix problems discovered during the inspection. Two weeks after the initial inspection, City came to ARMS to inspect the trucks. City claims that it found additional problems and that Luverne had not corrected many of the original problems.

4

The trucks were delivered to Cincinnati's Fleet Service Division in October 2001, and City conducted its final inspection.  City alleges finding the same problems in addition to new ones.  The list of problems was 18 pages.  City claims that parts and equipment did not comply with the contract, were missing, did not work properly, were improperly installed or insufficiently fastened, were cracked or damaged, and that the trucks leaked fluid in several locations.

After delivery, City drove one of the trucks to the same historic fire houses with small entries previously tested with the demonstrator truck.  The truck did not fit into one of the fire houses, which was slated to receive one of the new Luverne trucks.

On October 24, 2001, City had a meeting with Vonderhuevel to discuss the problems with the trucks.  After the meeting, Vonderhuevel and his employees returned the trucks to the ARMS facility.  On November 1 and 7, 2001, Gamel contacted Vonderhuevel about the problems with the trucks.  A conference involving representatives from Luverne, ARMS, and City was held on November 8, 2001.  City sent Lautt a Notice of Noncompliance with Contract Specifications and stated that City would seek liquidated damages effective October 27, 2001, the delivery deadline.

Representatives from City, Luverne, and Hartford met in Cincinnati on January 4, 2002.  Hartford and Luverne agreed to respond to the issues discussed within one week, and on January 11, Hartford submitted two proposals to City.  The first proposal involved re-manufacturing the body and pump compartments.  The rebuilt trucks would have been 113 inches high and 374 inches long.  One unit would have been ready for inspection by March 29, 2002, and the other three units would be ready by late May 2002.  The second proposal involved a partial rebuild with a $150,000 discount, reducing the height to 113 inches, and rebuilding the crosslays.  City notified Luverne on January 22, 2002, that it was rejecting both proposals because neither proposal brought the vehicles into full compliance with the contract specifications.

City contends that many components of the trucks failed to comply with the contract specifications.  First, it complains that the trucks were too high.  Luverne points to contract language listing the overall height as 116 1/4 inches.  City claims that Gamel contacted Fornell about the discrepancy between the stated height in the bid document and the height depicted in the drawing.  The trucks as delivered were approximately 114 inches high.

Because of their height, the Luverne trucks did not fit into all of the fire houses.  One new truck did not fit into its assigned fire house; another truck fit

6

through the door of its assigned fire house only if driven directly through the center of the arched doorway.  The City Fire Apparatus Supervisor feared that during an emergency, a fire fighter may not properly align the truck to clear the doorway.

Second, City contends the width of the truck is erroneous.  After measuring the doorways of the smaller fire houses, City determined the maximum overall width of a truck could not exceed 99 inches.  Upon delivery, the body of the trucks measured 99 inches but the total width including accessories was 103 inches.  Even though the contract stated that overall length would not exceed 372 inches, the trucks totaled 373 inches.

Third, there were problems with the crosslay hose storage area.[2]  The contract specifications indicate two crosslay hose beds in each truck with a 1 1/2 inch mechanical swivel hose connection to permit hose usage from either side of the apparatus and an adjustable hose bed partition.  The partition was to be 1/4 inch thick with a horizontal 1 3/4 inch flange on each side and fully adjustable.  The bottom of the hose bed compartments were to have individual removable aluminum grating pieces 4 5/8 inches wide.  Luverne agreed to these specifications in the bid form and contract.

---

[2]The crosslay hose storage area is located immediately behind the cab of the truck and runs the width of the truck.  It stores the smaller-capacity hose that firefighters typically use first to attack a fire.

During the preconstruction conference, moreover, Gamel showed Fornell trucks with a double-stack design. City claims that Fornell advised Luverne that the crosslay beds were to be a double-stack design. When the trucks were delivered, the crosslays were only 3 3/4 inches wide, and the hose was not adjustable. City claims that this narrow design prevented connecting the hose to the mechanical swivel or placing a nozzle on the crosslay, thus making the crosslays not functional. Although Luverne offered to cure this defect, City did not allow the cure attempt.

Fourth, City alleges a defective large hose storage area in the rear of the truck. City requested a lower than normal hose bed height to accommodate shorter firefighters. The contract therefore specified a hose bed deck no higher than 54 inches above ground. Fornell noted on the contract that the hose bed on the preliminary drawing measured 59.5" but that the engineering department could reduce the height by approximately 12" without reducing hose bed capacity. In the contract data form, Fornell instructed Luverne to "note and follow closely the specified heights of the hose bed flooring. The purchaser will measure these heights closely upon delivery." City measured the hose bed height as 57 inches upon delivery. Luverne contends that it was impossible to provide a 54" hose bed and meet other specifications.

Fifth, City specified in the contract that "SELF-TAPPING SCREWS ARE NOT ACCEPTABLE." The contract data sheet further stated that self-tapping screws were not acceptable to the purchaser and that all fasteners, including chassis fasteners, must have a self locking nut or use of a nutsert. The contract also stated that "in an area where there is no access to the rear of a panel, nutsert inserts shall be used." Luverne did not use nutsert inserts in all places where there was no rear panel access, but it offered to cure this defect.

As a result of these defects alleged by City, City rejected the trucks and refused to pay for them. Luverne and Hartford filed suit on February 12, 2002, seeking a declaratory judgment stating that Luverne complied with the contract, that City is obligated to pay the entire contract price, and that City is not entitled to damages. City denied these allegations and filed a counterclaim alleging breach of contract. City asserted that Luverne failed to deliver trucks that fully conformed to the contract and that it was, therefore, entitled to reject the trucks and recover damages.

## STANDARD OF REVIEW

"Judgment as a matter of law is appropriate only when all of the evidence points one way and is 'susceptible of no reasonable inference sustaining the position of the nonmoving party.'" Belk v. City of Eldon, 228 F.3d 872, 877 (8th Cir. 2000) (quoting McKnight v. Johnson Controls, 36 F.3d 1396, 1400 (8th Cir.

9

1994)).  The court may grant post-verdict judgment as a matter of law only where the evidence is "entirely insufficient to support the verdict." Id.  The court views the evidence in the light most favorable to the nonmoving party. Manus v. American Airlines, Inc., 314 F.3d 968, 972 (8th Cir. 2003).   In determining whether to grant judgment as a matter of law, the court must not engage in weighing or evaluating evidence and cannot consider questions of credibility.  Hawkins v. City of Farmingham, 189 F.3d 695, 701 (8th Cir. 1999).

Authority to grant a new trial on a motion pursuant to Fed. R. Civ. P. 59 is within the sound discretion of the court.  Douglas County Bank & Trust Co. v. United Financial Inc., 207 F.3d 473, 478 (8th Cir. 2000) (citing Gray v. Bicknell, 86 F.3d 1472, 1480 (8th Cir. 1996)).  "District courts enjoy broad discretion in choosing whether to grant a new trial, and thus, [appellate courts] accord great deference to their Rule 59 rulings." Douglas, 207 F.3d at 478.  A new trial may be necessary because of trial error, verdicts against the weight of the evidence, or damage awards that are excessive or inadequate.  Gray v. Bicknell, 86 F.3d 1472, 1480 (8th Cir. 1996).  A new trial will be granted when a miscarriage of justice occurred in the first trial.  Larson v. Farmers Co-op. Elevator of Buffalo Center, Iowa, 211 F.3d 1089, 1095 (8th Cir. 2000).  A miscarriage of justice occurs when there is not sufficient evidence to support the verdict.  Id. (citing First State Bank of Floodwood v. Jubie, 86 F.3d 755 (8th

10

Cir. 1996)).  When a district court applies the proper legal standard and finds that the verdict is not against the weight of the evidence, the district court's denial of a Rule 59 motion is virtually unassailable.  <u>Pulla v. Amoco Oil Co.</u>, 72 F.3d 648, 656 (8th Cir. 1995).

**DISCUSSION**

**1.     Height and Length of Pumpers**

Luverne did not deliver trucks in full compliance with the contract terms by the October 27, 2001, delivery deadline.  Based on the trial testimony and exhibits, City contends that the court should have entered judgment in its favor and limited the jury's role to determining its damages.  Among other defenses, Luverne alleged that City waived its right to full compliance with all the specifications of the contract.  Whether a party has waived a contractual provision is a question of fact to be submitted to the jury.  <u>State Auto. Mut. Ins. Ass'n v. Lind</u>, 172 N.E. 361, 364 (Ohio 1930).  "It was the function of the court to determine whether there was <u>any evidence</u> in the case from which a waiver may be found.  It was the function of the jury to determine . . . whether there had been a waiver."  <u>Id.</u> at 509 (emphasis added).  Luverne had to show by a preponderance of the evidence that:

> (A)  the City voluntarily relinquished its right to full and complete compliance with the contract;
> (B)  the City was aware of the right to demand full and complete compliance with the contract at the time of the waiver;

11

(C)  the City intended to waive the right of full compliance at the
time of the waiver;
(D)  the City had full knowledge of the relevant facts at the time of
the waiver;
(E)  Luverne Fire reasonably changed its position in a substantial
way in reliance upon the waiver; and
(F)  the waiver was the result of a clear, unequivocal, and decisive
act by the City.

See 2 Ohio Jury Instructions 253.25.

The jury heard testimony from Luverne CEO Jeff Lautt that City had
agreed to accept pumpers if Luverne could reduce the height to 113.  There
was also testimony that City had agreed to a 113 inch height at a pre-
construction meeting held on June 13, 2001.  Lautt also testified that City had
agreed to accept trucks that were 373 inches long, or one inch longer than the
specified 372 inches.  Thus, there was some evidence that City had waived
strict compliance with the height and length requirements, and the court
properly submitted the issue to the jury.  See State Auto. Mut. Ins. Ass'n, 172
N.E. at 364.

If the jury believed Lautt's version of the case rather than City's version,
it could properly find that City waived complete compliance with these
specifications.  A reasonable jury could believe that City voluntarily and
intentionally waived its right to full compliance with the contract, because City
was in the best position to know whether the trucks would be adequate despite
being an inch too tall or an inch too long.  A reasonable jury could find that
Luverne reasonably changed its position in reliance on the waiver, because it

12

transported the trucks from South Dakota to Cincinnati.  If City had insisted on full compliance and rejected the trucks prior to shipment, Luverne could have sold them to someone else or at least avoided the transportation expenses.  Viewing the evidence in the light most favorable to Luverne, a reasonable jury could find that City waived its right to full compliance with the specified height and length of the pumpers.

2.    **Width of Pumpers**

City and Luverne disagreed about the meaning of several contract terms, including the definitions of "overall width" and "overall body width."  Luverne contended that the width specifications referred to the width of the truck body, while City argued that it referred to the width of the truck body plus accessories.  Interpretation of a written agreement is a matter of law for the court, when it is clear and unambiguous.  DiGioia Bros. Excavating, Inc., v. Cleveland Dep't of Pub. Utils., 734 N.E.2d 438 (Ohio 1999).  The court found that the aforementioned terms were ambiguous.  When a contract is ambiguous, its interpretation is a question of fact for the jury.  Valmac Indus., Inc. v. Ecotech Mach., Inc., 738 N.E.2d 873, 876 (Ohio App. 2 Dist. 2000).

The width terms called for an overall width of 99 inches.  The truck bodies were 99 inches wide, and the pumpers as delivered were 103 inches when measured with accessories.  The jury heard conflicting testimony about whether the 99 inch width term applied to the body of the truck, or to the truck

body plus accessories.  Luverne cited evidence that in the fire truck industry,

"overall width" means the width of the body, without accessories.  A reasonable

jury could, therefore, conclude that the width term applied to the truck body

only, and that Luverne complied with the width specifications.

**3.      Pumper Crosslays and Storage Compartments**

City and Luverne disagreed about whether the pumpers were built with

the crosslays specified in the contract.  City wrote letters to Luverne asking for

double stacked, adjustable crosslays.  Luverne argued that the crosslay hose

storage section of the contract did not specify double stacked crosslays.  See

City of Cincinnati Division of Purchasing Contract at 47-48.  Luverne also

alleged that the diagrams in the contract depicted a single stack design.  Thus,

whether the trucks complied with the crosslay specifications was a factual

issue to be resolved by the jury.  When a contract is ambiguous, its

interpretation is a question of fact for the jury.  See Valmac Indus., 738 N.E.2d

at 876.

City alleged that storage compartments were the wrong shape and size,

and were in the wrong location in the pumpers.  This could delay the response

to a fire, because firefighters would not know where their equipment was stored

and would waste time looking for it.  Luverne introduced evidence that the

compartments met standards for storage compartments because they were

larger than what the contract specified.  Luverne also introduced evidence that

City had not requested a specific location for the compartments.  Accordingly, this raised a factual dispute that a reasonable jury could resolve in Luverne's favor.

### 4.    The Right to Cure Other Defects

Several other defects were either cured by Luverne or addressed in Luverne's proposed cures.  City contends that the contract did not contain a right to cure.  City argues that if the contract did contain one, the contract provided that time was of the essence.  Thus, the right to cure did not extend past the October 27, 2001, delivery deadline.  City further alleges that it gave Luverne a reasonable time to cure the defects, and that Luverne never actually cured the defects or proposed a cure that would address all of the defects.

The contract provided that "[i]f the vehicle has to be rejected for any reason, the Contractor shall be required to pick up the vehicle at the Fleet Services Division, accomplish all necessary corrections, and return the vehicle to the Fleet Services Division."  City of Cincinnati Division of Purchasing Contract at 5.  This provided a right to cure because it granted Luverne the right to correct any defects in the trucks and return them to City, rather than just keep the trucks and not collect a payment from City.

Under Ohio law, the right to cure provision must be interpreted to allow Luverne time to cure beyond the deadline.  See Quill v. R.A. Investment Corp., 707 N.E.2d 35, 40 (Ohio App. 2 Dist. 1997).  Otherwise, the right to cure

15

provision is a nullity, because it would only allow Luverne to cure defects if City permitted them to do so.  See id.  "A right to cure exercised at an opposing party's option is no right at all."  Id.  In construing a contract, effect should be given to all of its words if it can be done by any reasonable interpretation.  Id. "The clause at issue has effect only if it is understood as defining [Luverne's] rights after a breach."  See id.  Furthermore, City drafted the contract.  "It is an axiomatic rule of contract interpretation that any ambiguities in the document setting forth the rights and responsibilities of each party must be construed against the drafter of the document."  Hunker v. Whitacre-Greer Fireproofing, Co., 801 N.E.2d 469, 474 (Ohio App. 7 Dist. 2003) (internal quotations omitted).  The court, therefore, found that the cure provision extended beyond the deadline, despite the provision that time was of the essence.

City asserts that the court failed to consider the contract as a whole in deciding that it contained a right to cure provision extending beyond the delivery deadline, and should have submitted the issue to the jury rather than interpreting the contract against the drafter.  City relies on Gottlieb & Sons, Inc. v. Hanover Insurance Co. for its argument that courts must consider extrinsic evidence when interpreting a contract before interpreting it against the drafter.  See 1994 WL 144539 *4 (Ohio App. 8 Dist. 1994).[3]  In Gottlieb, the court held that if a trial court is unable to discern the meaning of an

_____

[3]Under Ohio law, unpublished cases may be cited and are persuasive but not binding.  Oh. St. Rpt. Opinions Rule 2(G).

ambiguous insurance contract after considering extrinsic evidence, then the court should construe it against the insurance company.  Id. at 5.  Gottlieb, however, is distinguishable from the case at bar, because the dispute in Gottlieb involved an insurance contract.  See id.  In fact, all of the cases cited in Gottlieb as support for its holding are insurance cases.  See Winningham v. Sexton, 820 F. Supp. 338 (S.D. Ohio 1993); Travelers Ins. Co. v. Buckeye Union Cas. Co., 178 N.E.2d 792 (Ohio1961); Bobier v. National Cas. Co., 54 N.E.2d 798 (Ohio 1944).  Because binding Ohio authority requires the court to construe non-insurance contracts against the drafter, the court did not err in construing the contract against City.  See Hunker, 801 N.E.2d at 474.

City contends that it provided Luverne with a reasonable time to bring the defective pumpers into full compliance with the contract specifications. Where a contract does not supply a specific time period, a reasonable time is inferred.  Oil, Chem. & Atomic Workers Int'l Union v. Martin Marietta Energy Sys., Inc., 646 N.E.2d 883, 886 (Ohio App. 4 Dist. 1994).  Determining what is a reasonable time to cure is a question of fact that depends on the nature, purpose, and circumstances of the action taken to cure the defect.  General Motors Acceptance Corp. v. Grady, 501 N.E.2d 68, 71 (Ohio App. 9 Dist. 1985). Given the complexity of the pumpers, the industry practice of using custom built trucks with "give-and-take" in the specifications, and the many years that City planned to use them, a reasonable jury could conclude that City did not

give Luverne a reasonable time to cure the defects.  It rejected the pumpers on January 22, 2002, less than three months after the due date.

Luverne failed to comply with the contract terms by delivering pumpers that had fluid leaks, missing screws, and self-tapping screws where the contract specified the use of nutserts.  City introduced evidence of other defects, such as automatic tire chains that smacked against the fuel tank, the use of a steering wheel that blocked the speedometer, a step that was too small to comply with safety regulations, and dials that were the wrong color.  The jury heard testimony that all of these defects were either cured by Luverne, or would have been fixed in one of Luverne's proposed cures.  Because the contract included a right to cure beyond the deadline date, a reasonable jury could find that City breached the contract by refusing to allow Luverne to cure these defects.

**5.   Hose Bed Height**

The preliminary drawing of the pumpers provided for a hose bed height of 59.5 inches.  City wanted it lowered to accommodate shorter firefighters, so Luverne agreed to provide a 54 inch high hose bed.  Upon completion of the pumpers, the hose bed was 57 inches high.  Luverne stated that it would be impossible to comply with other specifications if it had to lower it to 54 inches. The court denied Luverne's request for an impossibility defense and refused to instruct the jury on such a defense.

The court granted City's request for a "perfect tender rule" jury instruction.  The court instructed the jury that "if you find that the pumpers failed in any respect to conform to the contract, City's rejection of the good was proper as long as it was in good faith.  'Good faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

The perfect tender rule has been adopted by Ohio in its version of the Uniform Commercial Code.  See Ohio Rev. Code § 1302.60, U.C.C. § 2-601.  Parties to any contract must comply with the standards of good faith and fair dealing.  Butler County Bd. of Comm'rs v. Hamilton, 763 N.E.2d 618, 636 (145 Ohio App. 12 Dist. 2001).  The court is not aware of any Ohio authority analyzing the interplay between the perfect tender rule and the implied obligation to act in good faith.  Case law from other states establishes that even where the perfect tender rule applies, a purchaser may only reject nonconforming goods if he or she acts in good faith.  See, e.g., Printing Center of Texas, Inc. v. Supermind Publ'g Co., 669 S.W.2d 779, 784 (Tex. App. 14 Dist. 1984) (holding that if the evidence establishes nonconformity in some respect, buyer is entitled to reject if he rejects in good faith); Alden Press, Inc. v. Block & Co., 527 N.E.2d 489, 493 (Ill. App. 1 Dist. 1988) (notwithstanding perfect tender rule, the reasonableness of a buyer's rejection of goods and whether such rejection of goods is in good faith are ultimately matters for the

19

trier of fact); Y & N Furniture, Inc. v. Nwabuoko, 734 N.Y.S.2d 382, 385 (N.Y. Civ. Ct. 2001) (finding that the perfect tender rule is the law of New York, but the obligation of good faith that is part of every UCC contract applies to the buyer's rejection of goods).

"Evidence of circumstances which indicate that the buyer's motivation in rejecting the goods was to escape the bargain, rather than to avoid acceptance of a tender which in some respect impairs the value of the bargain to him, would support a finding of rejection in bad faith." Printing Center of Texas, 669 S.W.2d at 784. For example, evidence that a buyer rejected goods with minor defects because of changes in market conditions may be sufficient to support a finding of bad faith. Id.

In this case, the jury heard testimony that City was satisfied with the proposed cures, but chose to reject the trucks so that they could receive liquidated damages from Luverne, or because its firefighters preferred a more expensive model from another manufacturer. Luverne CEO Jeffrey Lautt testified that the discussions with City were going well and that it appeared that they were on their way to reaching an agreement without litigation. He believed that City still wanted the trucks, but that it abruptly terminated the discussions and demanded $1.1 million in liquidated damages. The jury heard testimony that City was unreasonable in finding defects, including complaining to Luverne that there were dead bugs on the radiator of one of the trucks that

had been driven to Cincinnati from South Dakota. Regarding the hose bed that was too high at either 57 or 59.5 inches, Luverne had evidence that the new trucks that City purchased instead of its pumpers had a hose bed height of 60 inches. This suggests that City acted in bad faith when it rejected the trucks partly due to the failure of Luverne to provide a truck with a 54 inch high hose bed, or propose a cure that would reduce the height to 54 inches. Accordingly, a reasonable jury could find that City acted in bad faith when it rejected the trucks due to non-compliance with the specifications.

Based upon the foregoing discussion, the court finds that judgment as a matter of law is not appropriate because when viewed in the light most favorable to Luverne, there is sufficient evidence to support the verdict. The court finds that a new trial is unnecessary because the verdict is not against the weight of the evidence, and a miscarriage of justice did not occur at trial. Accordingly, it is hereby

ORDERED that defendant City's Motion for Judgment as a Matter of Law or in the Alternative New Trial (Docket 143) is denied.

Dated May 10, 2005.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

21